## GENERAL MILLS, Inc., v. CLARK et al.
### No. 110.

District Court, W. D. Missouri,
Central Division.

Oct. 21, 1943.

William S. Hogsett and Henry Depping (of Hogsett, Trippe, Depping & Houts), of Kansas City, Mo., and Rubey M. Hulen, of St. Louis, Mo., for plaintiff.

William Becker, of Columbia, Mo., and John T. Barker and Roy W. Rucker, both of Kansas City, Mo., for defendants.

OTIS, District Judge.

Although more than six weeks have been consumed in this trial—by far the longest in our nineteen years of service—the case is, in outline, simple. The plaintiff during several years sold defendants, on credit, feed for turkeys. Finally a note was asked and given for a balance due. Plaintiff has sued defendants on the note. Defendants have pleaded "failure of consideration" and counterclaimed for damages alleged to have been caused by alleged inadequacy of feed. In a case so simple the parties have called more than a hundred witnesses whose testimony fills 5,449 typewritten pages. Included among the witnesses have been scientists of high attainments,—from the University of Missouri, the University of California, the University of Minnesota, the University of Chicago, the University of Oklahoma and Michigan State (Agricultural) College. On that account the case has been, in our experience, unprecedented. In another respect also unprecedented. Leading counsel for plaintiff was William S. Hogsett. (Originally Honorable Rubey M. Hulen was counsel for plaintiff, but the case lasted so interminably that in the midst of it he was elevated to the federal judiciary.) Leading counsel for defendants was William G. Becker, ably assisted by Honorable John Barker, strategist par excellence. Messrs. Hogsett and Becker have exhibited such a mastery of the facts and law, of the sciences involved, of human psychology, and of the art of their calling, as we have not seen often and as has made us more proud even that we have been of the great profession of the law. Also worthy of mention is the fact that in this long trial not one heated or discourteous word has been spoken either to opposing counsel or any witness. (Now and then there may have been a lifted eye-brow or a smile of kindly incredulity; even they were almost benevolent.) In this case the velvet covering on steel gauntlets never was once removed. But we knew that under the velvet was steel.

The case was jury waived. Had the issues been submitted to a jury (the issues

were issues of fact chiefly) the jury would have retired, deliberated, returned with a verdict, "For Plaintiff" or "For Defendant." No explanation, no elaboration. (When even an intelligent juror does discuss the verdict usually it seems less intelligent than otherwise it might have been thought to be.) Perhaps the judge, passing on the facts, would be wise to be as reticent. But we think counsel, who have waived trial by jury, are entitled to know by what reasoning decision of fact issues has been reached. The court may not convince counsel against whose client the decision has gone (never have we had that fortune), but something has been achieved if counsel are convinced that the case has not been decided arbitrarily, as by the toss of a coin.

Simple as is the case in general outline the chiefly controverted issue is simpler still. There was no real controversy that the note sued on was signed and past due, no real controversy that for four years defendants bought feeds from plaintiff in great quantities, no real controversy that the feeds bought and used contained no deleterious element or that every element they did contain was not nutritious to the turkey flock, no real controversy that plaintiff did not, at least in its literature, represent that its feeds were "complete," that is, in themselves sufficient, without other supplement than grains, to nourish the individual turkey from its first emerging into this vale of tears until the fulfillment of its destiny under the Thanksgiving axe. The controversy was about vitamins.

Despite the words of "the Preacher, the Son of David, King in Jerusalem", vitamins are something new under the sun. At least the word is new. Neither Shakespeare nor Milton used it; neither Samuel Johnson nor Noah Webster incorporated it in his dictionary. The word is new and knowledge of the thing is new, the thing has been always. Vitamins are essential to growth and life in men and in turkeys. And no feed for turkeys is, in itself, a "complete feed" which does not contain the vitamins. There is no controversy about that.

But did the feed sold by plaintiff contain the vitamins turkeys require? Plaintiff says, "Yes;" defendants say, "No." Directed to the issue so made was almost all the testimony. The testimony was of two classes: (1) The testimony of scientists. (2) The testimony of turkey raisers.

Every scientist and every layman who testified impressed us as endeavoring to tell the full truth of his knowledge. Of course, man for man, in our judgment, the testimony of the scientist is worth more than the testimony of the layman. (We would not say that the testimony of one honest scientist would outweigh the testimony of forty honest laymen.)

We shall remember all the scientists who testified in the case with pleasure and respect for their great knowledge and intellectual integrity. But the plumed knight, from defendants' standpoint, was Dr. Hogan (Albert G. Hogan Ph. D., College of Agriculture, University of Missouri). Without his testimony the counterclaim had little to support it. But the testimony of such a scholar supports much. Among all the dramatis personae, Dr. Hogan stands out. None seeing him in the witness chair and hearing him testify could have any doubt that he is a real scientist, who, during long, laborious years, has devoted his fine talents to the acquisition and dissemination of truth, for truth's sake alone. All his testimony indicated modesty concerning his own conspicuous services, respect for the views of others (although he might differ with them), frankness in testimony (he did not testify as one who weighs each answer before he makes it, to judge whether it will be helpful to a particular litigant), courage to maintain a position taken through conviction against the powerful assault of a cross-examiner of unequalled skill. Any university might well be proud to have such a man on its faculty.

Curiously enough, the witness who for us stands out among those called by plaintiff was a little girl, thirteen years of age, bright, alert, refreshing, charming. We have forgotten, as we write, what is her last name, her first name is Barbara. She raised a little flock of turkeys on plaintiff's feed and on the witness stand related her experience. Barbara and her flock (even as David and his "smooth stones out of the brook") may prove a match for giants.

### For the Counterclaim

■ 1. If the turkey feed which plaintiff sold defendant were deficient in essential vitamins, when fed according to plaintiff's feeding program, that is a fact which would have real significance. So far as the counterclaim is concerned, the burden of proving that fact is on defendants. It must

be proved as facts are proved in courts of justice, not absolutely (nothing can be so proved), but with reasonably certainty. But it must be proved, not guessed at, not suggested merely, not the fruit only of speculation. And it must be proved as to the very feed defendants bought from plaintiff and fed their turkeys. All this was clear from the beginning to defendants' highly competent counsel. They sought to discharge the burden by evidence which we divide in several parts.

The first part was made up chiefly of the testimony of Richard Clark, one of the defendants. The impression he made on us, as a man and citizen, was good, certainly as good as that of any greatly interested witness in any case. After many years of observation we do not hold human beings to the standards of archangels. (Even those standards are variable. See Michael v. Beelzebub, Paradise Lost, Bks. 1-4.) Let him who, looking through colored glasses, does not actually see things differently than they appear to normal vision, throw the first stone at his brother who must look through colored glasses. Even a learned lawyer now and then may be found who does not see his adversary's strong points as clearly as he sees his own. We have known lawyers—and admired them—yes, and on occasion emulated their practices— who could not so much as read a deposition without giving, not unconsciously, such emphasis to certain words as the witness never dreamed of.

Richard Clark's testimony was intended to create—and created—something of an impression that plaintiff's feed might not be all it should be. He testified that there were three periods in his experience. In the first he did not use plaintiff's feed. In that period, he said, he prospered. In the second period, of four years, he used plaintiff's feeds. The results, he said, were ruinous. In the third period he used other feeds than plaintiff's and Fortune smiled once more. Much of the force of his testimony was dissipated by cross-examination, but there was still substance in it which was not destroyed. None, however, would contend that his testimony alone made a case on the counterclaim.

A second part of defendants' case was the testimony of Dr. Hogan. It was the very heart of the case for the counterclaim. In 1940 Dr. Hogan conducted actual laboratory tests (we shall not speak of his later tests) to determine whether plaintiff's feed was adequate, when fed, with grains, as a complete feed. The feed he used in his tests was bought on the market (it was not concocted by him from plaintiff's formula). The conclusion which he reached was that the feed used in his tests, fed in the laboratory, lacked sufficient amounts of certain vitamins essential to the growth and health of turkey poults. Turkey poults given that feed alone, and grains, although otherwise not diseased, would be affected injuriously by malnutrition. We are bound to say that we believed that the force of his testimony, when limited to such a situation as was described by him, was unshaken by cross-examination and by all conflicting testimony dealing with the technique of his tests. Since we accept Dr. Hogan's conclusions, we shall not speak of corroborating testimony by other outstanding scientists connected with the University of Missouri.

A third part of defendants' case was made up of the testimony of lay witnesses, turkey raisers, some small, some large. They were eight or nine in number. Their testimony suggested, but, of course, did not prove, that plaintiff's feed might be lacking in certain vitamins.

### Against the Counterclaim

2. Plaintiff's defense to the counterclaim likewise may be divided into parts. In Part 1 the method of manufacturing the feed in question was described in great detail, by oral and written testimony and by moving and still pictures. The precautions to procure first class ingredients and to control their admixture automatically, so that proportions would not vary, were made plain. And made plain were the efforts of the plaintiff to discover, at an elaborate experimental farm maintained and operated by it in Michigan, whether the feeds produced by it, when tried out on living birds (also, as to animal feeds, on animals), would produce strong, vigorous, and healthy stock. The effect of this testimony was a strong impression that plaintiff earnestly had endeavored to create a feed which would fulfill its promises to the public. That impression was deepened by the showing, incidentally made, that plaintiff's employees, at least those in important positions, were trained men. It was made yet stronger by the showing, also incidental, of the long and successful history of the plaintiff, of the nation-wide extent of its business, of its huge investment. Common sense teaches that it is to the interest of

such a concern not to put out an inferior product. It does not surprise us that the medicine man at the county fair, who is here today and gone tomorrow—whence he came and whither he goeth no man knows—might sell a worthless "cure-all" which cures nothing. It would surprise us if Sears Roebuck & Company were to do likewise. What possible motive, one asks himself—the testimony is calculated to induce the question—could such a company as plaintiff have in intentionally and deliberately selling turkey feed calculated, not to produce turkeys, but to destroy them? Could any course be as suicidal? Would such a course knowingly be risked to save the microscopic difference between the cost of a whisp of vitamin X and a couple of whisps?

A second part of plaintiff's case was made up of the testimony of scientists. They too were outstanding scholars. We have named the distinguished institutions of higher learning they represented. Their testimony was intended to produce two effects: (a) To show that Dr. Hogan's experimental tests (his authority and distinction were acknowledged) were inadequate and inconclusive, and (b) to show that other experimental tests produced results differing from Dr. Hogan's, not, like this, unfavorable to plaintiff's feeds.

The criticism of Dr. Hogan's technique was forceful and forcibly presented. (1) If he were testing the adequacy of feeds he should have used normal birds, not birds already weakened, whether by disease or malnutrition. (2) If he used weakened birds, at least he should have run, as a control test, a second concurrent test with normal birds. (3) His tests should have included autopsies. (4) The numbers of birds he used in his tests were too small to support general conclusions; the results shown may have been the products of chance. Such were the chief points of the criticism. To our thinking, however, Dr. Hogan's conclusions (limited as they were by him) stood firm against the criticism. Not only in his original, but also in his rebuttal testimony, he answered the criticism, point by point, satisfactorily to us.

The experimentation of the scientists who were put on the stand by plaintiff,[1] did not quite, as we thought, reach the level of certainty attained by Dr. Hogan. One set of these experiments did not justify, so the experimenter himself said, a conclusion that plaintiff's feed either was adequate or inadequate. Another set was not quite so inclusive; the results tended to show that plaintiff's formula would provide a feed adequate for turkeys. But neither experimenter used plaintiff's feed as bought on the market. He used a feed concocted by himself from plaintiff's formula. (The difference, to our thinking, had some, but not much significance.) The testimony of these experts cannot be disregarded. When highly trained men, in the service of great institutions of learning, make an honest effort (certainly these efforts were honest) to find out whether a given feed has the essential elements, their pronouncements that they cannot say that it does not have the essentials is certainly not valueless. The scientist who says, from his experiments, "What I tested was inadequate" may have convinced us, but also, we are inclined to think, by reason of the counter testimony, the index on the scale must, even for him, just barely have moved beyond the central mark. If, in an appellate court of three judges, to which a case has been submitted, A votes, "Affirm," B "dubitante", and C waveringly "concurs" with A "in the result," we could not be too positive as to what is the law declared by that court.

A third part of plaintiff's defense to the counterclaim was impressive. Practical turkey growers were called in numbers. More would have been called if the court had not indicated to counsel, at long last, that there must sometime be an end to the procession of witnesses. They were of all kinds, young and old, men and women, rich and poor, small scale and large scale growers, from hither and yon. Honest men and women. (There was one who may have tampered a little, not with the truth exactly, but with his memory of facts.) Iowa, Missouri, Arkansas, Kansas, Colorado, with their varying climates, all were represented. The testimony of these witnesses was one chorus of approval for plaintiff's turkey feed. Such testimony cannot be disregarded. (Imagine a jury preferring the judgment of a doctor of philosophy to the testimony of three score

---

[1] No single part of Mr. Becker's great argument for defendants struck us so forcibly as his suggestion, powerfully put, that plaintiff must have had other tests than those described in testimony. But we have too many times charged juries that they cannot bottom findings on suspicion to fall ourselves into that error.

sons and daughters of the soil.) But there was an Achilles heel in the testimony of almost every one (not quite of all) of these good men and women. Defendants' counsel instantly shot his arrow to the vulnerable spot. Generally they supplemented plaintiff's feed with something else. "Ah, I thought so!", counsel seemed to say.

But we did not attach, in every case, quite the same importance to the confession as did counsel. Sometimes the supplement was substantial and significant,— a field of green plants, of alfalfa, of barley, of various grasses, brimming over, we suppose, with vitamins. Quite as often it was a few scattered weeds and tramped down remnants of dried verdure. In one case it was a bale of hay which turkeys pecked at, from which, we should think, a fowl would gather no more nutriment than a babe in arms derives from a teething ring.

If in the testimony of most of these lay witnesses there was this unknown quantity of supplement from which vitamins might have been derived, there were a few who used no supplement and who found plaintiff's feed entirely adequate. Among these was Barbara. One had to believe Barbara. Truth, innocence and brightness adorned her even as a mantle. Her turkeys, "cabined, cribbed, confined," grew and thrived and topped the market on plaintiff's feed. If they so much as saw a blade of grass it was through the bars of their prison in the distant scene. Perhaps Barbara's success was Providential. She deserved even that.

The cumulative effect of all this testimony was great. It seemed to fit in with what must have been the purpose of plaintiff, if plaintiff aimed at profit not in one year only, but year after year. It seemed to be corroborated by the experience of defendants themselves, as that experience was portrayed by them, not only in glowing testimonials, but otherwise. It seemed to fit in with the plaintiff's practice of risking its money on what its feed would do, for example, to the amount of almost $20,-000 in value advanced to the defendants, tenant farmers in Missouri. There was even some evidence in the case that a well known country lawyer, greatly honored and respected in Missouri and other states, whom few, if any, can mislead, observing what success defendants appeared to be enjoying through the use of plaintiff's feed, loaned them large sums to further their enterprise.

There was another important subdivision of plaintiff's case against the counterclaim. The plaintiff could not deny that in 1940 defendants' turkey project failed dismally. In that year turkeys on defendants' farm died like Nazis under the wheels of Stalin's Juggernaut. A season which began with 25,000 eggs ended with 80 birds fitted for the feast. It was a year of devastation on defendants' farm. None denied it. There has been nothing like it among human kind except the plague in Athens described so graphically by Thucydides and the Black Death in London pictured so vividly by Defoe. Yet both of these calamities were instances of abounding public health compared with what happened in the Clark Brothers' turkey world in 1940. Noah's flood was a little more devastating. (It was survived by only seven pairs of turkeys.) Plaintiff felt it must explain the disaster which defendants claimed was the result of malnutrition. It was not malnutrition, said plaintiff; it was disease, infectious disease. And here plaintiff chiefly relied on one witness, namely, defendant, Richard Clark, not testifying on the witness stand at the trial, but explaining, in letters and other writings in 1940, the unfortunate experience of defendants antedating the trial. Over and over again Mr. Clark ascribed his losses in 1940 to such diseases as Pox, Pullorum, and Trichomoniasis.

The effect of this testimony was at least to suggest to the mind that disease must have had something to do with the debacle of 1940. If it had something to do with it, how much? And if there were two causes for defendants' loss, one a deficiency in plaintiff's feed and the other the intervention of the gods, is not the burden on the defendants to show what amount of loss was attributable to malnutrition and what to disease? Are the defendants driven to the extermity of contending that disease was not at all a factor in bringing about their loss, that malnutrition caused all of it?

Again the effect of the testimony dealing with the question—Was it malnutrition or disease which was the cause or the principal cause of defendants' great loss in 1940? —was to induce the inquiry, how widespread was this scourge? The feed sold to defendants was used in immense quantities from one end of the continent to the other. If the use of it almost annihilated defendants' flocks, there must have been at least an approximation of that effect in every

quarter of the land. The evidence did not indicate anything of that kind. No other suit for damages! Scarcely another complaint! On the other hand, if defendants' turkeys were struck with an epidemic of disease, that might well be local, or confined to a single geographic zone, or, if general, might well be spotted, attacking some flocks, not touching others. Defendants' learned counsel counter by saying: "Only rarely was the feed in question used as a complete feed; in that case only was there malnutrition; in 1940 defendants used it as a complete feed." So there is yet another subdivision of plaintiff's case against the counterclaim. It concerned a single point. A very important point. Did defendants use no supplement in 1940? Did defendants, in that year only, try the "complete feed" program?

It seemed to us that plaintiff and defendants alike almost avoided the point, shied away from it. Each side appeared to be content to have something on the subject in the record to which attention might be called, a sentence in five thousand pages, unnoticed when it was uttered, but dug up and exulted over, like another Kohinoor, in the summation. Plaintiff seizes upon a single sentence in the cross examination of Richard Clark to show the defendants in 1940 used in supplement "plenty of range." And the defendants relied on a single positive statement of the same witness, made, as we remember it, late in the trial, to the effect that in 1940 no range whatever was utilized by defendants. And yet there must have been scores of persons among the families, neighbors and employees of defendants who could have been used on this point. They were well known to the defendants. It is not certain plaintiff knew them. None was called.

### Tentative Conclusions

3. Thus we have described some of our observations and processes of our thought as the case developed, some of the impressions we have of the whole case as we view it after argument. (And what an argument! We would need two laurel wreaths if this were a contest of skill.) We thought it was desirable to set out what we have written. We know that only the formal findings of fact and conclusions of law and the judgment bottomed on them are essential (perhaps they only will be read), but we wished to raise the curtain so that, as through a window, something of our thinking might be discerned. That thinking has led us to tentative conclusions (final conclusions, we say again, are in the formal findings). (1) The one sack of plaintiff's turkey feed, bought on the market, which Dr. Hogan used in his experiments was deficient, at the time he used it, to some extent, a slight extent, in essential vitamins, and if fed without any supplement, would not adequately nourish turkey poults. (2) In manufacturing its turkey feeds plaintiff honestly endeavored to put out a good and useful product and did put out a good and useful product. (3) There has been no proof that the feed manufactured by plaintiff and sold defendants was worthless or that any single ingredient entering into it was not valuable as a turkey feed; there is not the slightest question that the feed put out by plaintiff, as generally used by American turkey growers and as it was used generally, if not always used, by defendants, would nourish and develop turkeys satisfactorily and so as to return a profit. (4) The feed sold by plaintiff was a "complete feed," if the word "complete" is understood in the meaning in which it has been used in Government bulletins and in other scientific writings. (5) Whether the feed sold defendants by plaintiff was a "complete feed," is a more narrow sense, that is, in the sense that no vitamin bearing supplement whatever was required, provided a considerable time elapsed between manufacture and feeding, is a question which cannot be answered certainly upon the record; the negative has not been proved. (6) The conclusion of Dr. Hogan as to the sack of feed used by him on the turkeys used by him, accepted by us as true, is a circumstance favoring defendants, to be considered with other facts and circumstances in evidence. (7) It has not been proved that the deficiency found by Dr. Hogan in the sack of feed used by him in his experiments was due to any intentional or negligent omission by plaintiff. (8) Whether defendants, during any year, did use the feed sold them by plaintiff as a "complete feed," in the narrow sense, that is, without some vitamin supplying supplement, is a question which cannot be certainly answered upon the record; the affirmative has not been proved. (9) The losses sustained by defendants in every year in which they used plaintiff's feed, and especially in 1940, were due in large part to infectious turkey diseases.

## Statement of Issues, Findings of Fact, Conclusions of Law, Judgment

### Issues

1. Whether the note sued on was given, is due and payable.

2. Whether there was total or partial failure of consideration for the note sued on.

3. (a) Whether (as the issue is made by the pleadings) the feeds sold defendants by plaintiff were represented, guaranteed and warranted as containing all the elements necessary for normal, healthy, non-diseased turkeys, when the feed is used in ordinary turkey farm operations such as defendants conducted. (b) Whether (as might be the issue upon the evidence) the feed sold defendants by plaintiff were represented as complete feeds, which, when used in accordance with plaintiff's feeding program, required no supplement, and that when fed turkeys in complete confinement would constitute a complete diet.

4. Whether the feeds sold defendants by plaintiff were as represented and that whether the representation was that indicated under 3(a) or that indicated under 3(b).

5. What damages, if any, were sustained by defendants.

### Rulings on Evidence

1. Certain items of evidence were received subject to objections. Those objections now are overruled.

2. Objections to hypothetical questions put to witnesses by plaintiff's counsel were overruled. Those rulings have been reconsidered. They are adhered to. The court certifies, however, that the Findings of Fact are bottomed upon the evidence, whether the answers to the hypothetical questions referred to are included or excluded.

### Findings of Fact

1. The note sued on was executed by defendants and is due and payable. By its terms defendants are indebted to plaintiff in the sum of $17,804.92, as principal, $3,204.88, as interest, $1780.49, as attorney's fee, a total of $22,790.29.

2. There has been no failure of consideration, complete or partial.

3. The feeds sold defendants by plaintiff were in accordance with and met the representations touching those feeds made by plaintiff to defendants.

4. The losses sustained by defendants in the years they used plaintiff's feed largely were caused by infectious diseases.

### Conclusions of Law

1. Plaintiff is entitled to recover on its note in accordance with its terms.

2. Defendants are not entitled to recover on their counterclaim.

### Judgment

This cause coming on to be heard upon the pleadings, the evidence submitted, and the argument of counsel, and the parties having been fully heard and the court being fully advised in the premises, and findings of fact and conclusions of law having been made by the court, it is by the court ordered, adjudged and decreed (1) that the plaintiff have and recover from the defendants on its note, $17,804.92, as principal, $3,204.88 as interest, $1,780.49 as attorney's fee, being a total recovery on the note of $22,790.29; (2) that defendants have and recover nothing from plaintiff on their counterclaim; (3) that the costs be assessed against defendants.